Exhibit A

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| SUFFOLK, SS | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JENNIFER FURLONGE, )
    Plaintiff )
     )
vs. )  CIVIL ACTION NO  **14-0298**
     )
BOSTON MEDICAL CENTER, )
ALISTAIR BELL and )
WALTER DABEK, )
    Defendants )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**RECEIVED**
JAN 27 2014
SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## COMPLAINT AND JURY DEMAND

### NATURE OF ACTION

1. Plaintiff Jennifer Furlonge ("Furlonge") brings this action seeking the recovery of damages resulting from her termination of employment (1) in disregard of promises on which she detrimentally relied, (2) in violation of an implied contract based on policies and procedures set forth in a Policy and Procedure Manual, which was disregarded in her termination and (3) in violation of the protections of 42 USC § 1981.

### THE PARTIES

2. The plaintiff Furlonge is an individual residing in Randolph, Norfolk County, Massachusetts.

3. The defendant Boston Medical Center ("BMC") is a private, not for profit, corporation organized in and with a principal place of business in Boston, Suffolk County, Massachusetts.

4. The defendant Bell is an individual residing in the Commonwealth of Massachusetts.

5. The defendant Dabek is an individual residing in the Commonwealth of Massachusetts.

[1]

## JURISDICTION AND VENUE

6. The Superior Court has original subject matter jurisdiction over this matter pursuant to G.L. c. 212 § 4 and pursuant to the inherent authority of state courts to adjudicate claims arising under the laws of the United States.

7. This Court has personal jurisdiction over the defendant Boston Medical Center pursuant to G.L. c. 223A § 2 and over the defendants Bell and Dabek pursuant to G.L. c. 223A § 3.

8. Venue is appropriate in Suffolk County pursuant to G.L. c. 223, § 1.

## FACTS

9. Plaintiff Furlonge is a 61 year old black woman of West Indian, Caribbean ancestry and national origin.

10. Ms. Furlonge worked for Boston City Hospital/Boston Medical Center ("the Hospital") for twenty-six years. She began work at Boston City Hospital in 1987 as an Administrative Supervisor in the Evans Medical Group – Department of Medicine.

11. In the past twenty-six years, Ms. Furlonge has been promoted on two occasions and asked to create or manage six different departments/groups/clinics at the Hospital. She has indirectly reported to the Chiefs of the Medical Groups for Primary Care, Rheumatology, Dermatology, Gastroenterology, Cardiology, Pulmonary/Allergy/Asthma Podiatry, Hematology, Renal, and Oncology. She has overseen the conversion of paper records to electronic records in numerous departments.

12. Ms. Furlonge has a Master's Degree in Management. She had worked hard to bring a positive attitude to the job and to be caring toward staff, physicians and patients, and had always understood, up to the day that she was summarily fired, that she had gained the respect of both

her supervisors and the employees who worked for her, and with whom she dealt in union matters.

13. On or about July 26, 2009, Ms. Furlonge was promoted to the position of Administrative Director of the Adult Primary Care Ambulatory Clinic. As Administrative Director, she was responsible for the recruitment and training of Clinic support staff, preparing protocols for all Clinic support staff, preparing the budget for the Clinic, overseeing the clinic's telephone call center, overseeing patient scheduling and coordinating with the Clinic's nursing staff.

14. In June or July 2011, telephone access to BMC's Adult Primary Care Practice was outsourced to the consulting vendor group RISE HEALTH in Jacksonville, Florida. BMC kept on twelve (12) support staff on its Boston campus as direct first resource telephone access support. Ms. Furlonge managed these twelve (12) employees.

15. As of November 2011, Ms. Furlonge had direct supervisory responsibilities for fifty-nine (59) Full Time Employees: fifteen (15) front desk employees and ambulatory service representatives, twenty-two (22) medical assistants, six (6) practice managers, four (4) referral coordinators and twelve (12) telephone call center employees.

16. In November 2011, Ms. Furlonge met with her immediate supervisor John Barlow, Ambulatory Director of the Department of Medicine Clinics, Dr. Krishnamurthy, Vice Chair of the Department of Medicine, and Maureen Hilchey-Masters, Administrative Director of Ambulatory Services. Mr. Barlow, Dr. Krishnamurthy and Ms. Hilchey-Masters all asked Ms. Furlonge if she would agree to oversee a project, described as "temporary" in nature, to establish an Ambulatory Call Center in Boston, which would take over the work, which for the previous nine months had been outsourced to RISE HEALTH. Ms. Furlonge was told that the BMC was hemorrhaging money to Florida, and that BMC would like Ms. Furlonge to take on this

temporary project, given her experience overseeing the twelve (12) Boston based telephone call center employees and in helping to train the Florida based telephone center operators. She was told that she would have to devote herself full-time to the establishment of the Boston based Ambulatory Call Center, as she would have to hire and train twenty-five new employees, establish protocols for incoming and outgoing calls, and meet time standards for the amount of time that patients could acceptably be kept on hold. It was made clear that she did not have to accept the temporary assignment. Everyone in the room understood that the job was temporary. Ms. Furlonge was clearly promised either a return to her post as Administrative Director of the Adult Primary Care Practice, or a lateral or upward placement in a higher position after the end of the temporary assignment. Everyone understood the assignment to the Ambulatory Call Center was like previous short term assignments that Ms. Furlonge had taken on for the Hospital to oversee transitions of troubled or newly created programs. It was understood that Maureen Johnston, RN Clinical Manager, would temporarily oversee the forty-seven (47) Full Time administrative employees in the Adult Primary Care Clinic, whom Ms. Furlonge had previously overseen, and who were not moving to the new Ambulatory Call Center.

17. As of March 2012, the Ambulatory Call Center was up and running. Average "hold times" for 80% of patients had been maintained to RISE HEALTH's metrics of 30 seconds. Ms. Furlonge was informed that the new Ambulatory Call Center was saving the hospital in the vicinity of four to five million dollars quarterly. The Ambulatory Call Center access team, managed by Ms. Furlonge, won the BMC Customer Service Award. Ms. Furlonge was asked to temporarily remain at the Ambulatory Call Center to institutionalize the protocols she had successfully established, and to assist the defendant Walter Dabek, a Caucasian male, who had been hired by the hospital in October 2012, to head a demonstration project, establishing a call

center for Surgical, Podiatry, Pulmonary Allergy and Asthma, Renal and Gastroentology and Infectious Disease Clinics, which would mimic and parallel the ambulatory call center that Ms. Furlonge had established for Primary Care patients.

18. Mr. Dabek was given the title of Administrative Director of the BMC Patient Contact Center. At no time was Ms. Furlonge ever informed that she would be reporting to Mr. Dabek. Rather, she understood that she would provide him with assistance in establishing something similar to what she had already created from the ground. She understood that Mr. Dabek had twenty five years' experience in the retail industry, but absolutely no experience in hospitals or the medical industry. She understood, and it quickly became apparent, that he had no knowledge of line medical ambulatory programs, for which funding was conditioned on a hospital's documenting the number of patients reached in outreach efforts.

19. In 2013, the relationship between Mr. Dabek and Ms. Furlonge became uncomfortable. While Ms. Furlonge understood their relationship to be a partnership between equals, it was clear that Mr. Dabek viewed himself as possessing a dominant role over Ms. Furlonge, despite the fact that he had no responsibility over the Adult Primary Care call center, which Ms. Furlonge supervised, and he was in need of assistance in understanding the medical community.

20. Apparently threatened by the fact that Ms. Furlonge clearly worked longer hours than Mr. Dabek, Mr. Dabek "informed" Ms. Furlonge that she should not work such long hours, and questioned whether she worked such long hours because of a failed relationship at home.

21. On February 20, 2013, after budgeting for the entire Patient Support Center was transferred from Ms. Furlonge's supervisor John Barlow to the defendant Dabek, Ms. Furlonge emailed Mr. Dabek, inquiring what, if any, effect he understood his new budgeting responsibilities would have on Ms. Furlonge's authority. In response, Mr. Dabek wrote, "From a

management perspective, nothing should change. You do an awesome job of managing the PSC and the Primary Care (Practice) team. In terms of fiscal management - - we should talk about this too, but I don't see much in the way of changing it, especially ordering what you need, in terms of supplies, etc. But let's sit and talk. I would like to hear your perspective on things."

22. In fact, Mr. Dabek never did speak with Ms. Furlonge, and Ms. Furlonge understood the status quo to be in place in which she remained as the Administrative Director of the Primary Care Call Center and had continued responsibility for offering advice and consultation to Mr. Dabek. Unfortunately, the status quo of a strained relationship also continued, and Mr. Dabek remained resistant to her advice. In April 2013, Mr. Dabek took responsibility for implementing new telephone software for the Primary Care group. He did not invite Ms. Furlonge to initial meetings with Telecom personnel charged with implementing the software change. Consequently, software was developed for incoming calls only. Telecom personnel were not notified of the state's DSTI (Delivery Systems Transformation Initiatives) for developing software systems recording or logging important statistical information relating to "outbound calls". Specifically the current Massachusetts initiative in effect measured daily outreach to NEW patients to the practice resulting from outbound calls, which the software developed and approved by Mr. Dabek, was not going to measure. If Ms. Furlonge had not caught this error on Mr. Dabek's part, it would have cost the Hospital close to two million dollars in state support to BMC, of which Mr. Dabek was not aware. Upon learning that Ms. Furlonge had caught his mistake, rather than thanking Ms. Furlonge, their relationship only became more strained.

23. The relationship between Ms. Furlonge and Mr. Dabek totally broke down, when during a meeting attended with Alexia Rojas and Chenier Adolphe (held to discuss team building

efforts,) Mr. Dabek inappropriately broke into a monologue, which literally went on for minutes, in which he spoke with an accent mocking Ms. Furlonge and Ms. Adolphe's Caribbean accents.

24.     Unbeknownst to Ms. Furlonge, upon information and belief Mr. Dabek, while outwardly praising Ms. Furlonge, was working behind her back with the defendant Alistair Bell, to terminate her. In budget meetings held in August and September, 2013, Mr. Bell and/or Mr. Dabek decided to fill Ms. Furlonge's old position of Administrative Director of the Adult Primary Care Ambulatory Clinic, which she had promised she could have back, with Ellen Ginman, a 31 year old Caucasian. Ms. Furlonge was never interviewed for the position or asked if she wished to return to her old position. In addition, defendants decided to eliminate Ms. Furlonge's "temporary" position, and to fire her for allegedly budgetary reasons. In order to consolidate defendant Dabek's power, defendants merged the Patient Call Center headed by Mr. Dabek with the Primary Care Call Center headed by Ms. Furlonge, so that the "restructuring" would require the elimination of Ms. Furlonge's position. At the same time that Ms. Furlonge was being terminated for budgetary and restructuring reasons, Mr. Dabek created a "new" position of Manager of Quality in the call center, which took over some of the responsibilities, which had been handled by Mr. Furlonge. This position was given to Amber Connelly, also a younger Caucasian woman.

25.     On October 25, 2013, without any prior warning, defendant Dabek informed Ms. Furlonge that she was being terminated for business reasons, and that she should speak with Attorney Thuy Wagner about her options. Ms. Furlonge asked Attorney Wagner if Jason Worcester, MD, Medical Director, Joe Camillus, VP of Ambulatory Services or President of the Hospital Kate Walsh were aware of her firing. Atty. Wagner indicated that none of the above people were aware of the fact that Ms. Furlonge was being terminated. Atty. Wagner asked Ms.

Furlonge to sign a Separation Agreement and asked her to agree to a scripted announcement to all stating that "I have moved on to bigger and better things." Ms. Furlonge refused.

26.     On October 30, 2013, Ms. Furlonge met with Medical Director Joe Camillus. He informed Ms. Furlonge that he had been on vacation the previous week and had only learned that she had been fired upon his return. He acknowledged, "We didn't do this right." He stated the termination had nothing to do with the pretextual business and budgetary reasons set forth as the reason for the termination by the defendant Dabek, but in fact resulted from what Mr. Dabek considered to be Ms. Furlonge's broken relationship with Mr. Dabek.

27.     On October 28, 2013, Ms. Furlonge printed out a copy of her Personnel Profile, which showed her reporting to President Walsh, Mr. Camilus and Mr. Barlow, i.e. three people who had nothing to do with the decision to fire Ms. Furlonge. On November 8, 2013 (i.e. Ms. Furlonge's last day of work), Ms. Furlonge printed out another copy of her Personnel Profile. The Personnel Profile now showed Ms. Furlonge reporting to President Walsh, Mr. Camillus, and Mr. Dabek. In other words, after her termination, fully aware of the fact that Ms. Furlonge had already spoken with an attorney and the possibility of litigation, BMC wrongfully changed Ms. Furlonge's Personnel File for the purpose of seeking to conceal the fact that she had been terminated by a person without any authority to do so, and seeking to comport with the Hospital's contention that Ms. Furlonge was not wrongfully fired, but that her job was simply eliminated.

28.     At the time Ms. Furlonge was fired, the Hospital had over fifty Administrative Directors. Ms. Furlonge was one of only two black Administrative Directors at the Hospital, totally disproportionate to the population served by the Hospital as well as the medical staff at the Hospital.

29. Upon learning of Ms. Furlonge's termination, BMC President Kate Walsh wrote in an email to a physician at the hospital, who complained about Plaintiff's termination, that "[w]e blew this one. . . ." Nevertheless, she did not rescind the termination nor offer Ms. Furlonge her job back.

## COUNT ONE
## DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL
## (Defendant BMC)

30. Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1-29 of the Complaint as if fully set forth herein.

31. Defendant BMC, through the specific representations and assurances of John Barlow, Dr. Krishnamurthy, and Maureen Hilchey-Masters, promised Plaintiff that she could either return to her post as Administrative Director of the Adult Primary Care Practice, or that she would be given a lateral or upward placement in a higher position (hereafter "the promise"), if she would agree to leave her job as Administrative Director of the Adult Primary Care Practice to take on the temporary job of establishing an Ambulatory Call Center in Boston.

32. BMC intended to induce Ms. Furlonge to leave her position as Administrative Director of the Adult Primary Care Practice when they promised her that she could either return to her former position or she would be given a lateral or upward placement in a higher position as recompense for her agreeing to take on the temporary job of establishing an Ambulatory Call Center in Boston.

33. Plaintiff relied upon "the promise" in giving up her job as Administrative Director of the Adult Primary Care Practice.

34. Plaintiff's reliance upon "the promise" was reasonable.

[9]

35.     BMC arbitrarily fired Plaintiff without any cause to do so and without offering her the opportunity to return to her post as Administrative Director of the Adult Primary Care Practice and without offering her a lateral or upward placement in a higher position.

36.     Ms. Furlonge has suffered to her detriment and will continue to suffer financial harm as a result of her reliance on BMC's promise in an amount to be determined at trial.

WHEREFORE, Plaintiff asks for a jury to award plaintiff appropriate damages for her detrimental reliance on defendants' representations.

## COUNT TWO
## BREACH OF IMPLIED CONTRACT
## (Defendant BMC)

37.     Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1-36 of the Complaint as if fully set forth herein.

38.     The Plaintiff and the Defendant BMC entered into an implied contract through the promises and obligations set forth in BMC's Policy and Procedure Manual.

39.     Boston Medical Center's Policy and Procedure Manual # 7.10 ("Job Elimination and Re-Employment") provides that "Job elimination will not be used as a form of discipline." It further provides that positions, which are truly being eliminated, unlike in this case, will be eliminated through consolidation, attrition, transfer or re-assignment, with job elimination only being a final alternative.

40.     BMC, in breach of its implied contract with Plaintiff, both eliminated Ms. Furlonge's position as discipline for her inability in Mr. Dabek's mind to get along with him, and created a new position which she was not offered taking over many of her old responsibilities.

41.     The defendant breached the contract by unreasonably terminating Ms. Furlonge without resort to BMC grievance or discipline procedures.

42. As a direct and proximate result of the defendant's breach, the Plaintiff has suffered damages through loss of income, bonuses and benefits.

WHEREFORE, Plaintiff asks for a jury to award plaintiff appropriate damages for defendants' breach of the implied contract between plaintiff and defendant BMC.

## COUNT THREE
## VIOLATION OF 42 USC § 1981
## (All Defendants)

43. Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1-42 of the Complaint as if fully set forth herein.

44. Plaintiff is a member of a racial or ethnic minority group.

45. Defendants terminated Plaintiff and replaced her with Caucasian individuals.

46. Defendants proffered pretextual reasons for Plaintiff's termination.

47. Defendants have a pattern of discrimination against persons of color.

48. Defendants intentionally and purposefully discriminated against plaintiff on the basis of her race, color, ethnic status and and/or ancestry.

49. Defendants denied Plaintiff the ability to enjoy all the benefits, privileges, terms, and conditions of her contractual relationship with the defendant BMC, as defined by 42 U.S.C. § 1981(b), by reason of race-based animus.

50. Defendants acted with malice or with reckless indifference to the Plaintiff's federally protected rights.

51. The Plaintiff has suffered injuries as a result of Defendants' unlawful conduct.

WHEREFORE, the Plaintiff respectfully requests that the Court grant the following relief:

A.   Award Plaintiff compensatory damages in an amount to be determined at trial for the Plaintiffs' losses and injuries;

B.   Award Plaintiff punitive damages in an amount to be determined at trial that would punish Defendants for their willful, wanton, and reckless conduct and effectively deter Defendants from engaging in similar conduct in the future;

C.   Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

D.   Award Plaintiff such other relief as the Court deems appropriate and just.

### PLAINTIFF CLAIMS A TRIAL BY JURY

BY JENNIFER FURLONGE'S ATTORNEY

*/s/ Stephen Schultz*

Stephen Schultz, Esq., BBO # 447680
Engel & Schultz, LLP
One Federal Street, Suite 2120
Boston, MA 02110
617-951-9980
sschultz@engelschultz.com

Date:   January 27, 2013

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| **PLAINTIFF(S)** Jennifer Furlonge | | **DEFENDANT(S)** Boston Medical Center, Alistair Bell, Walter Dabek |
| **ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE** Board of Bar Overseers number<br>Stephen Schultz, BBO # 447680, Engel & Schultz, P.C., 1 Federal Street, Suite 2120 Boston, MA 02110 (617) 951-9980 | | **ATTORNEY (if known)**<br>Michael Bernardo, Esq., Director of Labor & Employee Relations, Boston Medical Center, 85 E. Concord St., Boston, MA 02118 |

Origin Code Original Complaint

BA2

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? *
_____ (B) (X Yes ( ) No

Claim Relating to Employment Agreement

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

This is an action arising out of Defendants' termination of Plaintiff from a temporary position of Administrative Director of the Hospital's Ambulatory Call Center, which she took only after being promised that she could return to her previous position of Administrative Director of the Adult Primary Care Practice. The termination was in violation of an implied contract established by the Hospital's Policy and Procedure Manual. There is a pendant federal claim of race discrimination. The Hospital refused to rescind the termination even after the Hospital President wrote in an e-mail to a physician, who complained about Plaintiff's termination, that "[w]e blew this one. . . ." The case requires knowledge of complex questions relating to state hospital reimbursement regulations and involves numerous parties who were involved in the decision-making process.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record _____

DATE: 1/27/14