UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * *
JENNIFER FURLONGE, )
    Plaintiff )
)
vs. ) CIVIL ACTION NO 1:14-cv-10389-FDS
)
BOSTON MEDICAL CENTER )
and )
WALTER DABEK, )
    Defendants )
* * * * * * * * * * * * * * * * * * *

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF
### HER MOTION FOR PARTIAL SUMMARY JUDGMENT

### Statement of the Case

On August 25, 2014, Plaintiff filed her Second Amended Complaint. In Count Two of the Second Amended Complaint, Plaintiff alleges that the defendant Boston Medical Center entered into an implied contract with her through the promises and obligations set forth in BMC's Policy and Procedure Manual, which they breached, by, among other things, eliminating her job, when elimination was not a final alternative, and transfer or re-assignment were practicable alternative. *Second Amended Complaint,* ¶¶ 41-43.

Plaintiff seeks Partial Summary Judgment on Count Two on the issue of liability only under the theory that defendants breached Boston Medical Center's Policy and Procedure Manual # 7.10 ("Job Elimination and Re-Employment").

### Statement of the Facts

On October 25, 2013, a letter was hand delivered to Jennifer Furlonge informing her that her position as Administrative Director in the Ambulatory Call

1

Center had been eliminated, effective November 8, 2013 (hereafter "the termination letter"). *Pl. Statement of Undisputed Facts* (hereafter "*Pl. Facts*"), ¶ 1.

The termination letter informed Ms. Furlonge that, if she were interested in applying for other positions at Boston Medical Center, she should look at postings online on BMC's web site, and wished Ms. Furlonge the best in her future endeavors. *Pl. Facts,* ¶¶ 3, 4.

Walter Dabek, another Administrative Director in BMC's Ambulatory Call Center, was the person who first suggested eliminating Jennifer Furlonge's position, which elimination in turn aggrandized the responsibilities of his own position. *Pl. Facts,* ¶ 10.

Walt Dabek had the same job classification as Jennifer Furlonge, as an Administrative Director of Call Center operations. *Pl. Fact,* ¶ 11. Mr. Dabek did not believe that Ms. Furlonge's position was necessary for an integrated call center operation. *Id.* Mr. Dabek believed that there was unnecessary duplication between his work and Ms. Furlonge's work. *Id.*

Dabek presented to the Hospital a scenario, under which all of the Hospital's call centers would be consolidated under his direction and no new space would be added to the call center. *Pl. Fact,* ¶ 12. This was in fact the scenario adopted by the Hospital. *Id.* Under this scenario adopted by the Hospital, Dabek noted that Jennifer Furlonge could be offered a downgrade from her Administrative Director position to a Manager position. *Id.* Dabek and the Hospital in fact never offered a position downgrade to Ms. Furlonge. *Id.*

In the reorganization of the Call Center, the Hospital created a new position of "Call Center Quality, Reporting & Scheduling Manager". *Pl. Fact,* ¶ 13. The Hospital did not offer this position to Ms. Furlonge nor give any thought to doing so. *Id.*

There was no discussion by any manager of Mr. Dabek and Mrs. Furlonge, as to whether or not it should have been Mr. Dabek rather than Ms. Furlonge who was terminated, when a decision was made to eliminate one administrative director position in the call center, yet any consideration of the skills, ability and documented work performance of the two employees. *Pl. Fact,* ¶ 14.

Despite the fact that BMC's CEO Kate Walsh was listed as one three person to whom Ms. Furlonge reported, Ms. Walsh was not involved in any discussion regarding the possibility of eliminating Walter Dabek's position rather than Jennifer Furlonge's position and does not know why Ms. Furlonge's position was eliminated rather than Walt Dabek's position. *Pl. Fact,* ¶ 15.

The decision to eliminate Jennifer Furlonge's position was made in approximately July, 2013. *Pl. Fact,* ¶ 16. Alistair Bell, the Vice-President of Strategy Implementation at BMC, participated in the decision to eliminate Ms. Furlonge's position. *Id.* Maureen Hilchey Masters, the Administrative Director of Ambulatory Operations was made aware of the decision to eliminate the position shortly after it was made. *Id.* In September 2013, shortly after Joe Camillus became Vice President of Ambulatory Operations, he was made aware of the decision, which had been made to eliminate Ms. Furlonge's position. *Id.*

After the decision was made to eliminate Jennifer Furlonge's position, the Hospital needed to go through a process to figure out how it was going to eliminate that position and what they were going to do with Ms. Furlonge, a process that can take months. *Pl. Facts,* ¶ 18.

Despite the fact that Joe Camillus was listed as one of three persons to whom Ms. Furlonge reported, he did not personally begin discussing the issue of what could be done for Ms. Furlonge until a couple of weeks before she was given her termination letter on October 25, 2013. *Pl. Facts,* ¶¶ 17, 19. Mr. Camillus had no idea what, if anything, BMC was doing to find another position for Ms. Furlonge in August and September 2013. *Id*.

Joe Camillus expected Thuy Wagner, an attorney in BMC's Human Resources Department, to come back to him with a proposal regarding how Jennifer Furlonge's job elimination would occur. *Pl. Facts,* ¶ 20. Joe Camillus did not speak to anyone (including either Thuy Wagner or Walt Dabek) prior to October 25, 2013 regarding finding an alternative position for Jennifer Furlonge. *Pl. Facts,* ¶ 21.

Alistair Bell did nothing personally to find another position at Boston Medical Center for Jennifer Furlonge. *Pl. Facts,* ¶ 22. Between the time of the budget meeting at which the decision was made to eliminate Jennifer Furlonge's position and October 25, 2013, Alistair Bell did not direct anyone below him or in Human Resources to identify alternate employment opportunities for Jennifer Furlonge. *Id.*

Marie Hilchey Masters did nothing to look for another position for Ms. Furlonge beyond seeing if any Administrative Director positions opened up, which were under her authority. *Pl. Facts,* ¶ 23.

On October 15, 2012, ten days before Ms. Furlonge was terminated, Alistair Bell wrote an email to Joe Camillus asking what happened to Jennifer Furlonge. *Pl. Facts,* ¶ 24. Camillus never got back to Bell. *Id*. According to Bell, if Camillus had gotten back to Bell, he would have had a full conversation with Camillus about what had been done to identify other options than termination for Ms. Furlonge, as he would do for any employee. *Id.* Bell admits that he did nothing during the three months after he learned that Ms. Furlonge's position was being eliminated to prevent her termination. *Id.*

On the date Ms. Furlonge was terminated, Thuy Wagner, an attorney in the Human Resources Department, handed Ms. Furlonge "the termination letter", and asked her to keep quiet about it. *Pl. Facts,* ¶ 25. She told Ms. Furlonge she had prepared a scripted response to people who might inquire as to why she was leaving, which would indicate she was moving on to bigger and better things. *Id.*

## **Argument**

**I.   The Undisputed Facts Establish That Boston Medical Center Breached an Implied Contract with Jennifer Furlonge not to Terminate Her Position Other than as a Last Resort, When it was not Practicable to Transfer Her or Re-Assign Her.**

Boston Medical Center Policy and Procedure Manual, Policy # 7.10 ("Job Elimination and Re-Employment"), issued on August 12, 1996 and in effect on October 25, 2013, provided in relevant part:

> BMC will eliminate positions, reduce work hours, or consolidate positions through attrition, transfer, or re-assignment when practicable, as determined by BMC, with job elimination as a final alternative. . . . If, within a department, there are multiple incumbents in the position(s) to be eliminated, then the department manager, in consultation with Human Resources will determine who to lay off, taking into consideration the skills,

5

ability and documented work performance of the employees in that position. . . .

Human Resources will help employees whose jobs have been eliminated and whose hours have been reduced to identify and explore other employment at BMC. Employees whose jobs have been eliminated or whose hours have been reduced will be given priority consideration for a position for which they are qualified over other equally or less qualified applicants. . . .

*Pl. Facts,* ¶ 7.

### A. The Promises Made in BMC's Policy and Procedure Manual are Binding as a Matter of Law.

As the Court stated in *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. 686, 691 (1996), "[t]he principle that promises made in a personnel manual may be binding on an employer is accepted in a clear majority of American jurisdictions. . . . The idea that an employer may ignore promises made in a personnel manual is in increasing disfavor in this country." The Court in *O'Brien* went on to state that an employee remaining with the employer after receiving a manual provides the consideration necessary to support the contract . *Id.* The Court specifically noted that of particular importance was the employer's historical "adher[ance] to the procedures set forth in its manual", *id. at 691-692,* and the employer calling special attention to the manual. *Id.* at 693. The Court added, that "[t]he fact that the . . . manual was not the subject of negotiation is neither significant nor surprising. Negotiation of the terms of a company-wide manual for nonunion employees is not likely and is not an essential precondition of the enforceability of the employer's obligations stated in the manual. . . . The fact that the employer did not intend to make such an offer, and that there was no explicitly bargained-for exchange, does not matter if employees in general would reasonably conclude that the employer

was presenting the manual as a statement of the conditions under which employment would continue." *Id. at 692-693.* The Court concluded that "Management distributes personnel manuals because it is thought to be in its best interests to do so. Such a practice encourages employee security, satisfaction, and loyalty and a sense that every employee will be treated fairly and equally. Management expects that employees will adhere to the obligations that the manual sets forth. . . . [There is a reluctance] to permit management to reap the benefits of a personnel manual and at the same time avoid promises freely made in the manual that employees reasonably believed were part of their arrangement with the employer. Management voluntarily offers, and defines the terms of, any benefit set forth in its unbargained for personnel manual. The employees may have a reasonable expectancy that management will adhere to a manual's provisions." *Id. at 694.* An employer cannot, on the one hand, expect its employees to be bound by rules of conduct in an employee handbook, while, on the other hand, treating the handbook as merely precatory when applying its strictures to management's actions. 45 *Mass. Prac. Employment Law* § 2.6 (2d ed.) (Contractual modification of the at-will doctrine – Personnel handbooks as employment contracts). An employer will be held to its assurances in its Employee Manual, if they "instill a reasonable belief in the employee" that management means what it says.). *Id.*

In this case, Ms. Furlonge notes that she had never seen a job elimination handled like hers, where alternative employment was not sought for the employee prior to their being terminated. *Pl. Facts,* ¶ 26. Rather, it was BMC policy to discuss with the employee other job openings at similar, higher or even lower grades,

7

determine the employee's interest in any such positions for which they were qualified, and to freeze those postings until the employee otherwise being laid off had an opportunity to interview for the open position(s).  *Id.*  She notes further that on or about the very first day of her employment with BMC, they specially called her attention to the manual.  *Id.*  As BMC called to Ms. Furlonge's attention the existence of its Policies and Procedures Manual on or about the very first day of her employment and adhered to the policies of its Policies and Procedures Manual relating to job elimination for everyone else, to Ms. Furlonge's awareness but herself, BMC should be held to the promises of Section 7.10 of its Policies and Procedures Manual.

  **B. Plaintiff was Terminated by BMC, when her job as Administrative Director in the Ambulatory Call Center was Eliminated.**

  Plaintiff was terminated by BMC, when her job as Administrative Director was eliminated.  Thus, her termination/job elimination was subject to the provisions of Section 7.10 of its Policies and Procedures Manual.

  Defendants have contended on a number of different occasions that Ms. Furlonge was in fact not terminated, but voluntarily left her job.  In their *Position Statement to the MCAD,* p. 4, (*SS Aff. Ex. # 12),* they argue "she left voluntarily." In its *Answer to Plaintiff's Interrogatories, Interrogatory # 1* (*SS Aff. Ex. # 13*), BMC states "Plaintiff was not actually terminated by Boston Medical Center."  Boston Medical Center CEO Kate Walsh testified both that "[w]e did not terminate Jennifer Furlonge", *SS Aff. Ex. # 9* (*Walsh Dep. at* 10)*,* and that Ms. Furlonge "voluntarily resigned".  *SS Aff. Ex. # 9* (*Walsh Dep. at* 15).

8

Undisputed facts show the speciousness of this claim, and the mere assertion of this unsupportable argument cannot create a dispute of material facts. Ms. Furlonge received a termination letter informing her that, if she were interested in applying for other positions at Boston Medical Center, she should look at postings online on BMC's web site, and wishing her the best in her future endeavors. *Pl. Facts,* ¶¶ 3, 4. According to the Hospital's Personnel Action form noting Jennifer Furlonge's departure from the Hospital, dated November 22, 2013, Ms. Furlonge was "involuntarily" terminated and "layed off". *Pl. Facts,* ¶ 5. Ms. Walsh, when not carefully parsing her words, as noted above, admitted that "she [Ms. Furlonge] did not voluntarily quit her job", "her position was eliminated", and she was not "terminated" for cause. *Pl. Facts,* ¶¶ 6, 8.

Defendants, in essence, argue that after they sent Ms. Furlonge a termination letter, and after an outcry of protest followed her termination[1], they allegedly offered her another job before the date that Ms. Furlonge's termination became effective pursuant to the October 25, 2013 letter that terminated her. However, the offering of a new different position, after terminating a person, does not somehow undo the original termination.

In Massachusetts, a "plaintiff's rejection of an objectively reasonable offer of reinstatement terminates an employee's eligibility for an award of damages based upon lost pay accruing after such a rejection." *Conway v. Electro Switch Corp.,* 402 Mass. 385, 389-390 (1988). The Supreme Court has noted that although a claimant

---

[1] A petition, signed by every single non-management employee, working at the Call Center under Ms. Furlonge, was sent to Kate Walsh protesting Ms. Furlonge's firing and requesting that the decision be overturned. *SS Aff., Ex. # 11.* (*BMC 0057-0058*)

need not go into another line of work, accept a demotion or take a demeaning position, he forfeits his right to back-pay, if he refuses a job substantially equivalent to the one he was denied. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 281 (1982). "[T]he wrongfully discharged employee need not accept a reemployment offer from the original employer, even if the salary is the same, where the offer of reinstatement involves a demotion and a change of duties." *Williston on Contracts §66:9* (2014). An employee should not be penalized for refusing an offer unless the right to damages for breach of the original contract (i.e. the employer's liability) is clearly preserved. *Id.*

In this case, there is a material dispute of facts over whether Ms. Furlonge was in fact ever offered another position by the Hospital, and, even if, *arguendo*, she were offered another job, whether it was comparable to the position from which she had been terminated. However, this material dispute of facts is not relevant to the issue of liability, i.e. whether Ms. Furlonge was terminated in breach of BMC's Policy and Procedure Manual, but is only relevant to the issue of damages resulting from the breach, i.e. whether Ms. Furlonge failed to mitigate her damages following her termination. In other words, there is a dispute of facts as to whether BMC made an "objectively reasonable offer of reinstatement", which potentially affects Ms. Furlonge's entitlement to damages after the alleged offer of reinstatement. There is no dispute of facts as to liability based upon her termination, but only a dispute of facts relating to whether damages were cut off after an alleged offer of reinstatement.

### C. Plaintiff's Termination was in Violation of Boston Medical Center Policy and Procedure Manual, Policy # 7.10 ("Job Elimination and Re-Employment").

Boston Medical Center's Policy and Procedure Manual required that they only eliminate a job position "as a final alternative" when "transfer, or reassignment" was not "practicable". The Manual further required that when there were multiple incumbents in a position, the employee's manager, in consultation with Human Resources, take into consideration the different employees' skills, ability and documented work performance in determining which of the incumbents should be terminated. Finally, the Manual required that Human Resources help employees whose jobs have been eliminated in identifying and exploring other employment at BMC.

In this case, the undisputed evidence is overwhelming that transfer or reassignment was practicable for Ms. Furlonge, but that she was nevertheless terminated. The evidence is also undisputed that although two persons (Ms. Furlonge and Mr. Dabek) both held the position of Administrative Director in the call center, it was Mr. Dabek who made the decision to terminate Ms. Furlonge, and none of the people who supervised and managed both Ms. Furlonge and Mr. Dabek ever considered the different employees' skills in determining who to terminate.[2] Finally, the undisputed evidence shows that Human Resources never sought to

---

[2] Plaintiff understands that there is a dispute of fact as to whether she or Mr. Dabek had a greater ability to administer the Call Center. What is undisputed is that no-one who supervised both Mr. Dabek and Ms. Furlonge ever considered the relative strengths of the two individuals before a decision was made to terminate Ms. Furlonge's position. The after-the-fact rationalizations, given today by various supervisors, as to why Mr. Dabek was better qualified than Ms. Furlonge, cannot overcome the failure to follow the Manual's procedures.

identify and explore other employment opportunities for Ms. Furlonge at the Hospital; rather they orchestrated her termination and prepared a statement she should read when asked why she was leaving the hospital.³

Kate Walsh, BMC's CEO, has admitted the practicability of transferring or reassigning Ms. Furlonge rather than terminating her. Ms. Walsh acknowledged that as of October 25, 2013, the date of Ms. Furlonge's termination, it was "doable" for BMC to transfer Jennifer Furlonge to another position rather than terminating her. *Pl. Facts,* ¶ 27. Ms. Walsh acknowledged that BMC had alternatives of placing Ms. Furlonge in a position outside of the call center rather than terminating her. *Pl. Facts,* ¶ 28. According to Walsh, BMC missed an opportunity to use the restructuring to help Jennifer Furlonge find another position in the hospital. *Pl. Facts,* ¶ 31. Ms. Walsh further acknowledged that she had no reason to believe that anyone in human resources sought to help Jennifer Furlonge to identify or explore other employment opportunities at Boston Medical Center prior to issuing her a termination letter on October 25, 2013. *Pl. Facts,* ¶ 29.

On November 6, 2013, BMC CEO Kate Walsh informed Dr. Susan Phillips, in response to an email complaining about the termination of Jennifer Furlonge,

> "Thanks for writing, you are right, this was handled badly by us. We needed to restructure the call center and had hoped to work with Jen to use her considerable talents in another ambulatory area - - we had a few ideas. Somehow in the discussion, Jen was terminated and we have been trying to reach out to straighten this out, but she is (justifiably) angry and not willing to re-engage. It may be cold comfort, but the person involved in HR was

---

³ The specific facts demonstrating defendants' failure to follow its own Policies and Procedures are set forth in detail in the "Statement of Facts" in this Opposition, and won't be repeated here.

12

terminated on Monday. We blew this one and I don't know what to do to fix it but we are committed to trying."

*Pl. Facts,* ¶ 30.

In addition to BMC CEO Walsh, BMC Vice President of Ambulatory Operations Joe Camillus has admitted that the Hospital made a mistake in sending Jennifer Furlonge a termination letter without another position being found for her and without having a conversation with her about other positions at BMC. *Pl. Facts,* ¶ 32. Camillus concluded that the Hospital could have worked harder than it worked and done a better job finding another position for Jennifer Furlonge prior to sending her the October 25, 2013 termination letter. *Pl. Facts,* ¶ 33. In response to the question whether "the hospital had done anything wrong?", Joe Camillus answered "Yeah." *Pl. Facts,* ¶ 34.

Finally, BMC Vice President of Strategy Implementation Alistair Bell completes the troika of top hospital administrators admitting wrongdoing on the part of the Hospital. Bell admitted that the termination of Jennifer Furlonge was badly handled in that the termination decision was made without escalating the decision to involve Joe Camillus or himself. *Pl. Facts,* ¶ 35. According to Bell, BMC did not make the right decision in terminating Jennifer Furlonge rather than finding her another position. *Pl. Facts,* ¶ 35. He concludes that BMC did not make the right decision in sending Jennifer Furlonge a termination letter on October 25, 2013, i*d.*, and did not make the right decision in informing Jennifer Furlonge that she was being terminated as of November 8, 2013. *Id.*

**Conclusion**

For the reasons stated in this Memo, Plaintiff's Motion for Partial Summary Judgment on the issue of liability only on Count Two should be allowed.

        BY JENNIFER FURLONGE'S ATTORNEY
        */s/ Stephen Schultz*
        Stephen Schultz, Esq., BBO # 447680
        Engel & Schultz, LLP
        One Federal Street, Suite 2120
        Boston, MA 02110
        617-951-9980
        sschultz@engelschultz.com

Date: May 13, 2015

Certificate of Service

I, Stephen Schultz, hereby certify that on May 13, 2015, a true copy of the above document has been filed through the ECF system and thereby will be sent electronically to counsel for Defendants identified on the Notice of Electronic Filing.

        */s/ Stephen Schultz*
        Stephen Schultz