## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
**JENNIFER FURLONGE,** )
)
**Plaintiff,** )
) **Civil No.**
**v.** ) **14-10389-FDS**
)
**BOSTON MEDICAL CENTER,** )
**ALISTAIR BELL, and WALTER DABEK,** )
)
**Defendants.** )
_____)

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action alleging unlawful employment discrimination on the basis of race.
Plaintiff Jennifer Furlonge worked in the call center of defendant Boston Medical Center.
Furlonge alleges that she was unlawfully terminated because of her race, and that BMC breached
its contractual obligations to her after it eliminated her position. Furlonge also alleges that
defendant Walter Dabek intentionally interfered with her relationship with BMC.

BMC and Dabek have jointly moved for summary judgment as to all of Furlonge's
claims. Furlonge has filed a motion for partial summary judgment on her claim for breach of
implied contract (Count Two). For the reasons described below, defendants' motion will be
granted in part and denied in part, and plaintiff's motion will be denied.

## I. Factual Background

The following facts are presented in the light most favorable to plaintiff except as
otherwise noted.

Boston Medical Center is a large non-profit hospital in the city of Boston that provides a

wide variety of medical services.  (Pl.'s Statement of Material Fact ¶ 1).[1]

Jennifer Furlonge is an African-American woman who began working at BMC in 2004. (Furlonge Dep. at 20, 25).  She did not sign a contract with BMC or otherwise negotiate the terms of her employment.  (Pl.'s SMF ¶ 2).  BMC did inform her, however, that it had a "Policy and Procedure Manual" that was available on-line for her review.  (Furlonge Aff. ¶ 2).[2]

In 2009, Furlonge was promoted to administrative director and given responsibility for administrative issues concerning BMC's primary-care practices.  (Pl.'s SMF ¶ 3).  As part of her duties, Furlonge was responsible for creating and supervising a call center for the primary-care practice that would handle the intake for patients seeking medical appointments over the phone. (Furlonge Dep. at 41).  As the call center's workload expanded, BMC contracted with Rise Health to operate a second, larger call center in Jacksonville, Florida.  (Pl.'s SMF ¶ 4).

In November 2011, BMC administrative director Maureen Hilcheymasters asked Furlonge to work on a project relocating the call center operated by Rise Health from Florida to Boston.  The project called for the Florida center to be combined with BMC's in-house call center that Furlonge had continued to supervise.  (Hilcheymasters Dep. at 7–8).  Hilcheymasters described the project as being temporary in nature, with a target completion date of March 1, 2012.  (Furlonge Dep. at 92–93, 112–14).  According to Furlonge, she was promised that she would be returned to her position in the adult primary-care practice once the relocation project was complete.  (*Id.* at 106–08).[3]

---

[1] All references to Plaintiff's Statement of Material Facts are to the statement of facts plaintiff filed as Docket #61 in response to defendants' motion for summary judgment.

[2] As described below, the Policy and Procedure Manual indicates, among other things, that the BMC Human Resources Department will "help employees whose jobs have been eliminated . . . to identify and explore other employment at BMC."  (*Id.* #7.10).

[3] The parties dispute whether Furlonge considered her call-center responsibilities to be a part of her job as Administrative Director of the Adult Primary Care Ambulatory Practice.  (Pl.'s SMF ¶ 5).

The relocation was completed in May 2012.  Furlonge, however, continued to manage the combined center on a daily basis and to perform various other duties in the center.  (*Id.* at 103–11).  Soon after the relocation, BMC decided to expand the call center, which was now completely located in Boston, to include practice areas beyond primary care.  (Bell Dep. at 17–18).  BMC further decided that it needed an expert to manage what would be an even larger center.  (*Id.* at 19–20).

On October 12, 2012, BMC hired defendant Walter Dabek as "Administrative Director of the Ambulatory Call Center."  (Dabek Dep. at 5).  Furlonge was not considered for this position, nor was she interested in being considered for it.  (Furlonge Dep. at 115–16; Bell Dep. at 19–20).

After Dabek was hired, Furlonge was not returned to her former duties in the adult primary-care practice.  Instead, she continued to work alongside Dabek in the call center. Generally, Furlonge had responsibility for the portion of the call center servicing primary-care patients, while Dabek was responsible for the portion servicing specialty-care patients. (Furlonge Dep. at 114–15, 205–06).

According to Furlonge, her former position as administrative director in the adult primary-care practice remained unfilled during the time she was working in the call center. (Pl.'s SMF ¶ 14).[4]  In the summer of 2013, however, BMC Vice-President of Operations Alastair Bell hired Ellen Ginman as Administrative Director for Primary Care Operations, effectively filling the spot previously held by Furlonge.  (Bell Dep. at 74–77).[5]

In the summer of 2013, Dabek was given responsibility for the integrated call center's

---

[4] BMC contends that Furlonge's former role was filled by Maureen Johnson; Furlonge contends that Johnson only oversaw the primary-care employees, and that those employees and Johnson continued to report to Furlonge.  (Pl.'s SMF ¶ 14).

[5] Although Ginman's official title did not match Furlonge's title, the parties appear to agree that Ginman was hired into the same position occupied by Furlonge before she began working with the call center in 2011.

budget.  (Furlonge Dep. at 134).  As part of his duties, Dabek prepared two fiscal-year 2014

budget "scenarios" that he presented to Bell in a July 2013 budget meeting.  (Bell Dep. 30–31).

One scenario contemplated an expanded call center with additional space and staffing, and the

other scenario called for no new space and leaner staffing.

Neither scenario included the possibility that Furlonge would retain her position as an

administrative director.  (Dabek Dep. at 84–86).  Under Scenario 1, the call center would not

receive additional space and would employ only six patient-service representatives; the call

center would employ only Dabek as an administrative director and Furlonge's position as an

administrative director would be eliminated.  (Merrill Decl. Ex. 11, at 2–3).  However, Scenario

1 did include the possibility that Furlonge could accept a position downgrade to "Manager,"

although she would keep her administrative director's salary.  (Dabek Dep. at 90).[6]  Scenario 2

called for increased space and staffing for the center and also would have eliminated Furlonge's

administrative-director position, although she again would have been able to remain employed in

a lesser position.  (Dabek Dep. at 84).

Bell chose Scenario 1.  (Bell Dep. at 30).  Dabek learned of Bell's decision in the late

summer of 2013.  (Dabek Dep. at 86–87).

On October 22, 2013, Furlonge, Dabek, and call-center supervisors Amber Connolly,

Chenier Adolphe, and Alexia Rojas met to discuss an e-mail from Connolly that had caused

some unhappiness among the call-center staff.  (Furlonge Dep. at 158–59).  During the meeting,

which became contentious, Dabek allegedly went into a monologue mocking the staff using a

Caribbean accent, and then stated that "[t]hey're all malcontents."  (Furlonge Dep. at 158–60;

Adolphe Dep. at 12–15, 19).

---

[6] BMC disputes whether Scenario 1 contemplated Furlonge being offered a reduced position.

Three days later, on October 25, Dabek informed Furlonge that her position was being eliminated effective as of November 8, 2013.  (Furlonge Dep. at 175–77).   Throughout her employment at BMC, Furlonge remained an at-will employee.

The parties dispute, among other things, (1) whether Furlong was offered another position running special projects for a BMC vice president; (2) what steps BMC took to try to find Furlonge another job; (3) whether Furlonge technically quit before she was actually terminated; and (4) whether the department manager undertook to consult with the Human Resources Department to determine who to lay off.

## II.    Procedural History

Furlonge filed the present action on January 22, 2014.  Her amended complaint alleges claims for (1) detrimental reliance (against BMC only); (2) breach of an implied contract (against BMC only); (3) discrimination on the basis of race in violation of 42 U.S.C. § 1981; (4) intentional interference with advantageous relationship (against Dabek only); (5) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623; (6) age discrimination in violation of Mass. Gen. Laws ch. 151B; (7) discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (against BMC only); and (8) discrimination on the basis of race in violation of Mass. Gen. Laws ch. 151B. Furlonge has voluntarily dismissed her age-discrimination claims.  BMC and Dabek have moved for summary judgment on all remaining counts.  Furlonge has filed a cross-motion for partial summary judgment on her breach of implied contract claim as to the issue of liability only.

## III.    Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id*. at 256–57.

## IV.    **Detrimental Reliance**

BMC has moved for summary judgment on Count One, which asserts a claim for detrimental reliance.[7]

Furlonge contends that she agreed to take on the call-center relocation project in reliance on BMC's "specific promise that she would be returned to her old position of Administrative Director of the Adult Primary Care Practice" after the relocation was completed.  (Pl.'s Opp. at 3).  Furlonge seeks "lost future wages, which more likely than not she would have continued to

---

[7] The parties and case law use the terms "detrimental reliance" and "promissory estoppel" interchangeably. In Massachusetts, the doctrine is formally known as "detrimental reliance."  *See Loranger Constr. Co. v. E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978).

earn," had she not left her original position in adult primary care.  (*Id.* at 5).

The doctrine of detrimental reliance provides that "a promise given without consideration is binding when the promissor should reasonably expect to induce action or forbearance if injustice can be avoided only by enforcement of the promise." *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 31 (1st Cir. 1988).  "Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent and when enforcing the promise would serve the interests of justice." *Steinke v. Sungard Fin. Sys.*, 121 F.3d 763, 776 (1st Cir. 1997); *see also Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995) ("[A]n action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration.").  "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation." *Rhode Island Hosp.*, 419 Mass. at 848 (internal quotation and citation omitted).

BMC relies on *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F. Supp. 278 (D. Mass. 1987), in support of its argument that the doctrine of detrimental reliance does not apply to an at-will employment relationship.  In *Treadwell*, the plaintiff, who was an at-will employee, alleged that he had detrimentally relied on his employer's promise that he would be placed in a retraining program in lieu of being fired.  *Id.* at 286.  The court held that the defendant's promise was enforceable under a theory of detrimental reliance, at least insofar as it promised the plaintiff employment for the period required for retraining.  *Id.*  The court reasoned that because the promise to retrain effectively transformed the nature of the plaintiff's employment from at-will into employment for a definite period, that definite period provided an "ascertainable period of time" for which damages (that is, wages and benefits) could be calculated.  *Id.*  The court further

held, however, that the promise was not enforceable beyond the period of retraining. *Id.* The court found that beyond the contemplated retraining period the plaintiff's employment remained at-will, and that "[t]he promise of secure and continued employment is simply too vague to be enforceable under the doctrine of promissory estoppel and thereby transform the nature of plaintiff's employment from at-will to employment for a definite period." *Id.*

As in *Treadwell*, Furlonge alleges that she was promised that following a temporary period of time away, she would be returned to her position in adult primary care—a position that she does not dispute was at-will. Thus, with limited exceptions, BMC could have terminated her employment at any time, whether or not she accepted the call-center assignment. *See Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 9 (1988) ("Employment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all."). Accordingly, she cannot now maintain that she reasonably relied on BMC's promise that she would be returned her position in adult primary care—and seek damages when she was not—when the precise nature of that promise was that BMC would "return" her to a situation in which it was free to terminate her employment at any time.

"Because the plaintiff had no expectation of continued employment, she cannot as matter of law establish any damages traceable to her termination." *Fitzgerald v. Queen Anne Nursing Home, Inc.*, 61 Mass. App. Ct. 1103, at *1 (2004); *see also Robinson v. Spencer Stuart, Inc.*, 2013 WL 3989672, at *10 n.16 (D. Mass. August 5, 2012) (plaintiff may not recover lost future wages on promissory estoppel theory). BMC's motion for summary judgment will therefore be granted as to Count One.

## V.   **Breach of Implied Contract**

The parties have filed cross-motions for summary judgment on Count Two, which asserts

a claim for breach of an implied contract.  Furlonge bases the claim on her contention that BMC failed to live up to its obligations under Policy #7.10 of its Policy and Procedure Manual.[8]

Furlonge's motion is for partial summary judgment on the issue of liability only.  In order to succeed, she must prove that (1) the PPM created binding obligations on BMC and that (2) BMC breached those obligations.

BMC has also moved for summary judgment, contending that the PPM was not binding; that Furlonge effectively quit before she was terminated; and that, regardless, it did not breach the terms of the PPM.

Under Massachusetts law, an employer's promises contained in a personnel manual may under some circumstances create an implied contract between the employer and an at-will employee.  *See generally O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686 (1996); *Jackson v. Action for Boston Community Development, Inc.*, 403 Mass. 8 (1988).  In deciding whether a particular manual has formed the basis of a contract, the determinative issue is whether "an employee could reasonably have believed that the 'employment manuals he or she was given constituted the terms or conditions of employment, equally binding on employee and employer.'"  *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 141 (1st Cir. 1998) (quoting *Derrig v. Wal–Mart Stores, Inc.*, 942 F. Supp. 49, 55 (D. Mass. 1996) (citing *O'Brien*, 422 Mass. at 694)).

In *O'Brien*, the Supreme Judicial Court listed several "factors that would or might make a

---

[8] The relevant portions of BMC Policy and Procedure Manual, Policy #7.10, state:

BMC will eliminate positions, reduce work hours, or consolidate positions through attrition, transfer, or re-assignment when practicable, as determined by BMC, with job elimination as a final alternative. . . . If, within a department, there are multiple incumbents in the position(s) to be eliminated, then the department manager, in consultation with Human Resources will determine who to lay off, taking into consideration the skills, ability and documented work performance of the employees in that position.

. . .

Human Resources will help employees whose jobs have been eliminated and whose hours have been reduced to identify and explore other employment at BMC.

difference in deciding whether the terms of a personnel manual" created an implied contract. 422 Mass. at 692.  Those factors include (1) whether the terms of the manual were negotiated; (2) whether the employer retained the right unilaterally to change the terms of the manual; (3) whether the employee signed the manual, acknowledged understanding of its terms, or if the employer otherwise called "special attention" to it; and (4) the manner of the manual's preparation and distribution.  *Id.* at 692–93.  Of these factors, the last is the most important: "Without minimizing the importance of its specific provisions, the context of the manual's preparation and distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment."  *Id.* at 694 (quoting *Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 299, *modified on other grounds*, 101 N.J. 10 (1985)).

Here, the parties do not dispute that the manual's terms were not negotiated and that BMC did not specifically retain the right to change the manual's terms unilaterally.  Those undisputed facts, however, do not settle the issue.  "Negotiation of the terms of a company-wide manual for nonunion employees is not likely and is not an essential precondition" to enforceability of the manual's terms.  *O'Brien*, 422 Mass. at 692.  And while the absence of any specific right retained by BMC to modify the manual's terms unilaterally is a fact weighing in Furlonge's favor, it is offset by the fact that there is no evidence demonstrating that she was ever required even to acknowledge the manual or its terms during her employment.

Furlonge states by affidavit that BMC brought the Policy and Procedures Manual to her attention at the start of her employment by telling her that it was "posted on-line" for her review. (Furlonge Aff. ¶ 2).[9]  In addition, she states that based on union contracts and the PPM, she believed that BMC employees would not be terminated as the result of the elimination of their

---

[9] BMC disputes whether Furlonge was subjectively aware of the relevant portions of the PPM.

jobs without BMC seeking to find the employee another position.  (*Id.*).  She also testified at her deposition that she personally observed the hospital attempting to find new positions for nurses whose jobs were being eliminated, and that she expected her elimination would be handled similarly.  (Furlonge Dep. at 230–31).

However, under *Hinchey* and *O'Brien*, Furlonge must do more than simply show that it was her subjective belief that her job elimination would be handled in a certain manner.  Instead, she must show that it was objectively reasonable for her to believe that the PPM created an obligation for BMC to handle her situation in that manner.  That she has not done.

First, Furlonge's observations of how nurses were treated following a job elimination does little to establish that she reasonably believed that the PPM obligated BMC to treat her in the same manner.  At her deposition, Furlonge testified that she was aware that nurses were unionized employees.  (*Id.* at 231).  She also was unable to testify to being aware of any non-union employees whose jobs were terminated being handled in a similar manner.  Thus, any belief that she had the same rights was simply not reasonable given that Furlonge herself was not a unionized nurse, but an at-will employee.

More importantly, Furlonge was not required to sign the manual, or otherwise formally or informally acknowledge that she had read it or was even aware of its terms.  According to her own testimony, BMC simply told her at the beginning of her employment that it was available online for her review.  The portion of the manual Furlonge submits as evidence was created on August 12, 1999.  (Schultz Aff. Ex. 5, at 6).  Even assuming that BMC informed Furlonge in 2004 that the manual was available online, and that the statement counts as "distribution," Furlonge has presented no evidence that BMC ever redistributed the manual to its employees in any manner at any other point during her employment.  Nor has she presented evidence that

BMC called "special attention" to the manual, or any attention to it at all, in any other fashion.

Under the circumstances, and as a matter of law, there is insufficient evidence to establish that Furlonge had an objectively reasonable belief that the Policy and Procedure Manual created promises that BMC was bound to uphold.  Therefore, because Policy #7.10 of the PPM did not constitute a binding promise, BMC cannot be held liable for any alleged breach of its terms.  Accordingly, BMC's motion for summary judgment as to Count Two will be granted, and Furlonge's motion for partial summary judgment will be denied.

## VI.    Title VII / § 1981 Claims

BMC and Dabek have jointly moved for summary judgment on Furlonge's federal race discrimination claims (Counts Three and Seven).

Furlonge contends that BMC discriminated against her based on her race in violation of both Title VII (Count Seven) and 42 U.S.C. § 1981 (Count Three), and that Dabek discriminated against Furlonge in violation of 42 U.S.C. § 1981 (Count Three).   Although Furlonge has asserted separate claims under Title VII and § 1981, the analysis of both claims is governed by an identical analytical framework and the Court will consider the two claims together.  *See Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir. 2008).

Where no direct evidence of discriminatory animus and causation exists, a plaintiff may establish the necessary elements by circumstantial evidence using the three-stage burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004).   Under that framework, a plaintiff must first establish a *prima facie* case of discrimination.  *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001)  Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment

action.  *Id.*  If the employer articulates such a reason, the burden shifts back to the plaintiff to

show that the proffered reason was mere pretext, and that the true reason was unlawful

discrimination.  *Id.* at 34.  Thus, "[a]t the summary judgment stage, the plaintiff must produce

evidence to create a genuine issue of fact with respect to two points:  whether the employer's

articulated reason for its adverse action was a pretext and whether the real reason was

. . . discrimination."  *Quinones v. Buick*, 436 F.3d 284, 289–90 (1st Cir. 2006) (quotation and

internal citation omitted).

For purposes of summary judgment, defendants do not contest that Furlonge has

established a *prima facie* case with respect to her Title VII claim.  (Defs.' Mem. at 15).[10]

Furlonge also does not appear to contest that defendants have met their burden of producing a

legitimate, nondiscriminatory reason for the elimination of her position—that is, that it resulted

from budgetary concerns.[11]

At the final stage of the *McDonnell Douglas* analysis, the burden shifts back to the

plaintiff to show that the employer's proffered reason is "'a coverup' for a 'discriminatory

decision.'"  *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6 (1st

Cir. 2000) (quoting *McDonnell Douglas*, 411 U.S. at 805).  In making that showing, the plaintiff

must demonstrate both that the articulated reason is "a pretext and that the true reason is

discriminatory."  *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir.

2000) (quoting *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999)).  "Plaintiffs may

use the same evidence to support both conclusions, provided that the evidence is adequate to

---

[10] Defendants do challenge whether Furlonge can establish a *prima facie* case of race discrimination under Mass. Gen. Laws ch. 151B.

[11] As discussed below, there is some dispute as to the precise legitimate, non-discriminatory reason defendants offer for Furlonge's termination.

enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Thomas*, 183 F.3d at 57.  When considering evidence of pretext, the court must keep in mind that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent."  *See Santiago–Ramos*, 217 F.3d at 54.

In the present case, Furlonge seeks to establish pretext by a three-pronged attack.

### A.   BMC's Failure to Study the Budget Consequences of the Call-Center Restructuring

Furlonge first contends that BMC's failure to undertake a specific study of the budget consequences of restructuring the call center is inconsistent with its claim of a legitimate, nondiscriminatory reason for eliminating her job.

### 1.   The Stated Reason for Furlonge's Termination

The first point of contention between the parties concerns the specific legitimate, nondiscriminatory reason for Furlonge's termination asserted by BMC.  Furlonge contends that BMC's stated reason was that her position was eliminated because of "budget reasons."  (Pl.'s Opp. at 11).  BMC, however, contends that Furlonge's position was terminated because of the "scale of the call center and the volume of work that was being done."  (Defs.' Reply at 15).

Curiously, BMC argues in its reply memorandum that it "made no . . . assertion" that Furlonge was terminated due to "budget reasons."  (*Id.*).  Nonetheless, in the very first sentence of BMC's memorandum of law, it states that Furlonge's "position was eliminated in November 2013 *for budget reasons*." (Defs.' Mem. at 1) (emphasis added).  The very next sentence implies that BMC did so because it "faced enormous financial challenges."  (*Id.*).  Furthermore, in BMC's own statement of facts, it states that "Bell understood that a possible outcome of his *budget decision* was that Furlonge would be laid off."  (Defs.' SOF ¶ 13) (emphasis added).

14

BMC only then explained that Bell believed that his budget decision was reasonable "given the scale of the call center and the volume of work that was being done." (*Id.*).

It is difficult to know what to make of BMC's position. At a minimum, however, it appears that there is a disputed issue of material fact as to the stated reason for Furlonge's termination.

### 2.   BMC's Alleged Failure to Study the Budget Consequences of the Call Center Restructuring

Where the actions an employer took at the time of a plaintiff's termination are inconsistent with the supposed legitimate, non-discriminatory reason it later gives for that termination, a reasonable fact-finder may conclude that the reason given is a mere pretext. *See, e.g.*, *Thomas*, 183 F.3d at 57 (pretext may be demonstrated by "evidence showing that the employer's articulated reasons is false.").

Furlonge contends that BMC's conduct at the time Bell opted for Scenario 1 is inconsistent with its explanation that she was let go because of reasons having to do with the budget. Specifically, Furlonge notes that Dabek testified at his deposition that he never undertook to study the effects on the budget of restructuring the call center's management team. (Dabek Dep. at 96–98). In addition, BMC CEO Kate Walsh testified that it was not her understanding that eliminating Furlonge's position would save BMC money. (Walsh Dep. at 13).

At oral argument, counsel for BMC conceded that while the management team may not have done a specific budget analysis concerning the net effect of restructuring the call center's management, such an analysis was not necessary because the difference in size and scale between the two competing scenarios effectively made it obvious that Scenario 2 would be much more expensive to implement. That may well be true. However, nothing in the record indicates

Bell or Dabek considered whether eliminating Furlonge's administrative director position was advantageous in Scenario 1 from a budgeting perspective given that (1) her position was being replaced with two additional managers and an additional supervisor; and (2) the scenario allowed for the possibility that she could stay on at the same salary in a manager's role.  In light of BMC's original stated reason for Furlonge's firing—"budget reasons"—a reasonable fact-finder could find the absence of any specific budget analysis to be at least some evidence of pretext.

      **B.**    **Dabek's Alleged Monologue**

"[S]tray remarks may properly constitute evidence of discriminatory intent for the jury to consider in combination with other evidence."  *McMillan v. Massachusetts Soc. for Prevention of Cruelty To Animals*, 140 F.3d 288, 300–01 (1st Cir. 1998) (citing *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 610 (8th Cir. 1997)).  However, such remarks carry more weight when made by the decisionmaker.  *See McMillan*, 140 F.3d at 301; *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 16 (1st Cir. 2007) ("When assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker.").

Furlonge contends that Dabek's monologue during their October 22, 2013 meeting in which he allegedly mocked the call center staff using a Caribbean accent is evidence that Dabek harbored a discriminatory animus.  BMC does not appear to contest that the monologue could be characterized as racially offensive.  BMC does, however, contend that Dabek's monologue is irrelevant because it was Bell, not Dabek, who made the decision to adopt Scenario 1.

    The parties agree that it was Bell who chose the budget scenario that would not involve expanding the call center's space or staff.  The parties also agree that neither of the scenarios that Dabek presented to Bell included a spot for Furlonge as an administrative director.  According to

Furlonge, Bell simply chose between the two scenarios presented to him by Dabek; because both of those scenarios eliminated Furlonge's position as administrative director, the result was a foregone conclusion. Thus, in Furlonge's view, Bell's decision was irrelevant because it occurred only after Dabek had decided that he would propose eliminating Furlonge's position under any scenario.

Furlonge also contends that Scenario 1—the scenario ultimately chosen—provided for a downgraded position for her at her then-current salary. She contends that Dabek again acted as the relevant decisionmaker when he failed to offer her the downgraded position even though Scenario 1 allowed him to do so. In support of her theory, Furlonge has submitted evidence in the form of a spreadsheet entitled "Scenario 1 (from VP Ops presentation)," in which a comment in the "Notes" column states, "If J. Furlonge accepts position downgrade, still gets paid current FY13 salary." (Merrill Decl. Ex. 11, at 2). In addition, although BMC contends that only Scenario 2 (the scenario that was not adopted) allowed for Furlong to accept a downgraded position, Dabek's own deposition testimony is unclear and seems to be in contrast with BMC's position.[12]

In short, Furlonge has identified sufficient record evidence to raise a genuine issue of material fact. A reasonable jury could conclude that it was Dabek, and not Bell, who was the *de facto* decisionmaker—not only with respect to whether Furlonge remained employed as an administrative director, but with respect to her continued employment in the call center in a downgraded position. Furthermore, in light of the fact that it was Dabek, and not Bell, who

---

[12] For example, during his deposition, Dabek was asked:

> Q: "So this Scenario 1 that you're talking about was the suggestion of Miss Furlonge having a possibility of taking on a manager position; is that correct?"

> A: That's correct.

allegedly engaged in the monologue mocking the call center staff, the resolution of Dabek's status as a decision-maker is material.

### C.   Statistical Evidence of Discrimination

Finally, Furlonge contends that BMC has a general culture of discrimination against black management personnel, pointing to statistical evidence tending showing an alleged dearth of black managers in leadership roles at BMC.  Statistical evidence of an employer's policies or practices may, under some circumstances, be probative in determining whether a general pattern of discrimination exists.  *McDonnell Douglas*, 411 U.S. at 805; *see also Sweeney v. Bd. of Trustees of Keene State Coll.*, 604 F.2d 106, 113 (1st Cir. 1979) (statistics showing absence of women in "upper ranks" of institution were relevant to "add color" to the decision-making process).  Furlonge's proffered statistical evidence indicates that BMC's president and five senior vice-presidents are all white, and that only one of 14 vice-presidents is black.  (Bell. Dep. at 12–13).

Generally, allegations of a discriminatory culture have less probative weight when, as here, plaintiff is alleging disparate treatment.  *Adamson v. Wyeth Pharmaceuticals*, 2005 WL 2323188, at *17 (D. Mass. Aug. 23, 2005); *see also LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993).[13]  This is because "[i]n a disparate treatment case . . . the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why."  *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 156 (1st Cir. 1990).  Moreover, the probative value of any such statistical evidence may be substantially outweighed by a danger of unfair prejudice, confusion of the issues, or waste of time.  *See* Fed. R. Evid.

---

[13] "A 'disparate treatment' cause of action accrues 'when an employer treats an employee less favorably than others because of her race, color, religion, sex, [ ] national origin,' or age."  *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993) (quoting *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 156 (1st Cir. 1990)).

403.[14]

In any event, the Court need not reach the issue of statistical evidence here.  Even without such evidence, and after "viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor," the Court concludes that Furlonge has raised a genuine dispute of material fact as to whether her termination was the product of unlawful racial discrimination.  *See Dominguez-Cruz*, 202 F.3d at 431 (quotation and internal citation omitted).  Of course, that evidence is strongly disputed by the parties.  Nonetheless, while the evidence is far from conclusive, and while other evidence may exist to controvert it at trial, Furlonge has produced enough to defeat summary judgment.  Accordingly, defendants' motion for summary judgment as to Counts Three and Seven will be denied.

## VII.   Mass. Gen. Laws ch. 151B

Defendants have also moved for summary judgment on Furlonge's state-law discrimination claim under Mass. Gen. Laws ch. 151B (Count Eight).  Massachusetts courts construe state anti-discrimination law the same as federal anti-discrimination law in most respects.  *See Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 40 n.11 (2005).  The Court analyzes the state claim separately only to highlight one potential difference in establishing a *prima facie* case.

"[A] plaintiff who is terminated from her position establishes a prima facie case of discrimination by producing evidence that [1] she is a member of a class protected by G.L. c. 151B; [2] she performed her job at an acceptable level; [3] she was terminated; and [4] her

---

[14] For example, assuming Furlonge's statistics are correct, fairness might require giving BMC an opportunity to produce evidence concerning the hiring and promotion of those twenty executives, including the qualifications of all of the candidates for those positions; their race, gender, and other characteristics; and the factors that went into the various hiring and promotion decisions.  Presumably, too, Furlonge would be entitled to an opportunity to rebut that evidence.

employer sought to fill her position by hiring another individual with qualifications similar to hers." *Id.* at 41.  In cases where a plaintiff was terminated as a result of a layoff, *Sullivan* also requires the plaintiff to put forth "some evidence that her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination." *Id.* at 45.

Defendants contend that Furlonge has not met this final requirement, and therefore has failed to establish a *prima facie* case for her discrimination claim under Massachusetts state law. For the reasons discussed above, Furlonge has done so, and therefore, defendants' motion for summary judgment as to Count Eight will be denied.

## VIII.   Intentional Interference with Advantageous Relationship

Finally, Dabek has moved for summary judgment on Count Four, Furlonge's claim that he intentionally interfered with her advantageous relationship with BMC.[15]

"In an action for intentional interference with advantageous relations, an employee must prove that (1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions." *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781 (2001).  Where, as here, the action is brought against an official of the employer, the "improper motive or means" element is satisfied only when the plaintiff shows that "the controlling factor in the alleged interference was actual malice." *Id.*  "Actual malice" is defined as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Wright v.*

---

[15] In her opposition memorandum, Furlonge invites the Court to consider her claim as intentional interference with either a "past business relationship or a prospective future relationship." (Pl.'s Opp. Mem. at 16). However, "an 'advantageous relation' is a 'contemplated contract' or *prospective* business relationship." *Buster v. George W. Moore*, 438 Mass. 635, 652 n.22 (2003) (emphasis added) (quoting *ELM Med. Lab., Inc. v. RKO Gen., Inc.*, 403 Mass. 779, 787 (1989)).  Because Furlonge specifically pleaded a claim for "intentional interference with advantageous relationship" only, the Court will consider only whether the evidence supports a claim for interference with a prospective relationship.

*Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992).

Dabek seeks summary judgment on Furlonge's claim for three reasons. First, he contends that the claim fails because Furlonge was an at-will employee—that is, because she did not have an actual contract for employment with BMC. Second, he contends that Furlonge has not identified evidence from which a reasonable factfinder could conclude that he acted with actual malice. Third, he contends that Furlonge has not identified specific evidence demonstrating that he was responsible for the decision to eliminate her position.

The resolution of the third argument is perhaps the easiest. As already discussed, a reasonable jury could find that Dabek was the relevant decisionmaker as to Furlonge's continued employment in the call center. The resolution of the first argument depends on the resolution of the second. Generally, a supervisor has the ability to discharge an at-will employee as long as the supervisor does not act with malice. *See, e.g.*, *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007) ("'[C]orporate officials' acting 'within the scope of their employment responsibilities' are 'privileged to act [unless they do so] out of malevolence, that is, with 'actual' malice.'") (quoting *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 663–64 (1981)). Thus, the real question becomes whether Furlonge has provided sufficient evidence for a factfinder to conclude that Dabek acted with actual malice.[16]

Under Massachusetts law, unlawful discrimination can be a form of actual malice. *Weber*, 434 Mass. at 782. If a jury determines that racial discrimination was the cause of Furlonge's termination, it "may take that into account in determining whether a 'spiteful, malignant purpose, unrelated to the legitimate corporate interest'" of BMC was the controlling

---

[16] Furlonge contends that Dabek was not her supervisor, and that therefore the malice standard is not applicable. However, because the Court concludes that she has identified sufficient evidence for a reasonably jury to find that Dabek did act with malice, it need not address the issue at this time.

factor in any interference by Dabek in Furlonge's relationship with BMC.  *Id.* at 782–83 (citing *Brunner v. Stone & Webster Eng'g Corp.*, 413 Mass. 698, 705-06 (1992); *Wright*, 412 Mass. at 476).

Thus, a reasonable jury could find both that Dabek was the relevant decisionmaker with respect to Furlonge's position and that he acted with malice in deciding to eliminate her position. Therefore, Dabek's motion for summary judgment as to Count Eight will be denied.

## VI.      <u>Conclusion</u>

For the reasons set forth above, defendants' motion for summary judgment is GRANTED with respect to Counts One and Two, and DENIED with respect to Counts Three, Four, Seven, and Eight.  Plaintiff's motion for partial summary judgment on Count Two as to the issue of liability only is DENIED.

**So Ordered.**

<u>/s/  F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated:  January 6, 2016                        United States District Judge